Kelvin J. MILES, Appellant,

v.

UNITED STATES, Appellee.

Nos. 81–731, 82–246.

District of Columbia Court of Appeals.

Argued March 10, 1983.

Decided Oct. 24, 1984.

---

Charles J. Ogletree, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Public Defender Service, Washington, D.C., at the time the brief was filed, was on the brief, for appellant.

Anita J. Stephens, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and David W. Stanley, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and MACK and BELSON, Associate Judges.

BELSON, Associate Judge:

In this consolidated appeal appellant seeks review of judgments of conviction for first-degree burglary, D.C.Code § 22–1801(a) (1981), and assault with intent to commit rape, D.C.Code § 22–501 (1981), and also of the trial court's subsequent order denying appellant's motion to vacate his sentence under D.C.Code § 23–110(a) (1981). Appellant contends: 1) that the government deprived him of his Fifth Amendment right to an independent grand jury by presenting to the grand jury transcripts of the testimony of the chief government witness given to a previous grand jury rather than his live testimony and by failing to present purportedly exculpatory evidence to the grand jury; 2) that the trial court erred in admitting the complainant's in-court identification of appellant; 3) that the trial court abused its discretion in failing to give missing witness instructions requested by the defense; 4) that the trial court abused its discretion in admitting evidence that appellant had agreed to come to a police station to discuss the crimes but failed to appear, and 5) that the prosecution commented improperly in closing argument on appellant's failure to testify. We find appellant's various contentions unpersuasive. Therefore, we affirm.

I

In the early evening of March 6, 1979, the complainant went to a convenience store for some groceries. While she was standing in the checkout line, a man, later identified as George Lane, attempted to start a conversation with her. Complainant ignored him and left the store with her purchases. Upon entering her apartment building, complainant again encountered George Lane, who was with another man later identified as appellant. Both Lane and appellant joined complainant in an elevator and got off with complainant on the sixth floor where her apartment was located. While in the elevator, appellant asked complainant her name. She gave him her first name.

Complainant went into her apartment. When she came back out into the hallway a few minutes later she saw appellant and Lane talking with a delivery man and with her neighbor, Bernice Barnes. Thinking that the two men must live in her apartment building, complainant remained in the hallway with them for a few minutes, then went with Barnes into Barnes' apartment. While she was there, one of the men, whom complainant did not see, knocked at the door and asked Barnes' daughter, Denise, for complainant. Denise told the man, whom she identified at trial as Lane, that complainant was not there. When he insisted that she was, Denise closed the door.

About 45 minutes later, complainant returned to her own apartment. The doorbell rang immediately and, thinking it was a neighbor, she opened the door. Standing alone in the doorway, appellant asked complainant whether he could use her bathroom. She consented. When appellant came out of the bathroom he grabbed complainant, told her he had a gun, forced her into her bedroom and demanded that she remove her clothes. He turned out the bedroom light and, according to complainant, he sodomized her.[1] After hitting her several times, he tried to rape her but proved physically incapable of doing so. A few minutes later complainant, thinking he

---

1. The indictment charged appellant with sodomy in violation of D.C.Code § 22–3502 (1981), in addition to first-degree burglary and assault with attempt to commit rape. He was acquitted of the sodomy charge.

had gone, phoned her sister. However, appellant immediately reappeared, shouted the name of complainant's sister into the phone, and then left the apartment.

Complainant gave physical descriptions of both appellant and Lane to the police when they arrived at her apartment.[2] About 3 weeks later complainant viewed a photo array, and identified Lane as her assailant with "90%" certainty.[3] The police arrested Lane.

On April 23, 1979, complainant attended a lineup which included Lane. Complainant positively identified Lane not as her assailant but as the companion of her assailant.[4] Charges against Lane were dropped. Lane was nevertheless taken before a grand jury where he denied involvement in the offense. He testified that appellant was with him outside complainant's apartment on the day in question and that appellant had told him the next day that he had had sexual intercourse with complainant. The grand jury was not asked to return an indictment and was dismissed.

In September 1979, appellant stood in a line-up which complainant did not attend. Shortly thereafter, she was shown a photograph of this line-up but did not recognize anyone.

In October 1979 a second grand jury was convened. Complainant testified, and the government introduced the transcript of Lane's earlier grand jury testimony. Because of delays, the grand jury's term expired prior to its return of an indictment.

Subsequently a third grand jury was convened. The government presented no live witnesses, but introduced transcripts of Lane's and complainant's earlier grand jury testimony. That grand jury returned an indictment against appellant.

Upon trial, the jury found appellant guilty of assault with intent to commit rape and of burglary. Appellant filed a post-trial motion to dismiss the indictment, alleging grand jury abuse. Following a hearing, the trial court denied appellant's motion.

After noting a timely appeal from his convictions, appellant filed a motion to vacate sentence pursuant to D.C.Code § 23–110 (1981), again alleging grand jury abuse. The trial judge held evidentiary hearings, primarily to inform himself concerning the respective proceedings of each of the three grand juries. Thereafter, the court denied appellant's motion. Appellant filed a notice of appeal from that order also.

II

Appellant's first contention is that the government deprived appellant of his Fifth Amendment right to an independent grand jury in that it presented to the third grand jury transcripts of Lane's prior testimony to a previous grand jury rather than live testimony, and in that it failed to introduce evidence to the third grand jury that purportedly exculpated appellant but inculpated Lane. We find appellant's arguments unpersuasive.

For centuries the grand jury's responsibilities have included "both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), citing *Branzburg v. Hayes*, 408 U.S. 665, 686–87,

2. Complainant described appellant as a light-complected black male 5'8" to 5'9" tall, with brown eyes, a long face, and a small mustache, and George Lane as a dark-complected black male, 5'8" tall with thick kinky hair, a mustache, and a goatee.

3. At trial, complainant testified that the black and white photograph did not accurately depict Lane's dark complexion but, rather, gave the impression that the person in the photograph had light skin. In addition, in the photograph, Lane was not wearing glasses and had no facial hair.

4. At trial complainant stated that although she had previously picked out Lane's picture as that of her assailant, she was "absolutely positive" that Lane was not her assailant.

92 S.Ct. 2646, 2659–60, 33 L.Ed.2d 626 (1972). "The grand jury's sources of information are widely drawn and the validity of an indictment is not affected by the character of the evidence considered." *Calandra, supra,* 414 U.S. at 344–45, 94 S.Ct. at 618–19, citing *Costello v. United States,* 350 U.S. 359, 363–65, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1956); *see also United States v. Washington,* 328 A.2d 98, 102 (D.C.1974), *cert. granted, rev'd on other grounds,* 426 U.S. 944, 96 S.Ct. 3162, 49 L.Ed.2d 1181 (1976). Accordingly, "[i]t is axiomatic that the prosecutor has considerable discretion in determining what evidence to present to the grand jury." *United States v. Boffa,* 89 F.R.D. 523, 530 (D.Del.1981), citing *United States v. Ciambrone,* 601 F.2d 616, 622 (2d Cir.1979). *See also United States v. Trass,* 644 F.2d 791, 796 (9th Cir.1981).

■ We have stated our general preference for live testimony at a grand jury proceeding, *Harvey v. United States,* 395 A.2d 92, 97 n. 11 (D.C.1978), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979). However, we have expressly sanctioned the prosecutor's use of a transcript of a witness' prior sworn grand jury testimony in a later, separate grand jury proceeding. *United States v. Wagoner,* 313 A.2d 719 at 720–21 (D.C.1974), citing *Costello v. United States, supra,* 350 U.S. at 363, 94 S.Ct. at 408. *See also, Harvey, supra,* 395 A.2d at 97 n. 11. In *United States v. Cruz,* 478 F.2d 408, 410–11 (5th Cir.1973), the United States Court of Appeals for the Fifth Circuit also relied on *Costello* in stating:

> While the presentation of hearsay testimony of an investigating officer in lieu of readily available testimony by direct witnesses is by no means a preferred procedure, it is neither unconstitutional nor inherently wrong. In the absence of

some showing that the integrity of grand jury proceedings has been impaired, an indictment even if based exclusively on such testimony will not be overturned on appeal.

The record does not reveal any attempt by the prosecutor to deceive the grand jury by the use of transcripts, as may occur where, for example, a witness' version of an occurrence has changed after a grand jury proceeding with the result that the new version negates probable cause *see, e.g., United States v. Provenzano,* 440 F.Supp. 561 (S.D.N.Y.1977). The grand jury was not misled into believing that it had received eyewitness rather than hearsay testimony; nor was this a case in which the grand jury would not have indicted a defendant if it had heard eyewitness rather than hearsay testimony. *See United States v. Estepa,* 471 F.2d 1132, 1136–37 (2d Cir.1972).

■ Lane's testimony to the first grand jury was based upon his personal knowledge and observation of appellant's activities, not upon hearsay. The record does not reveal any substantial change in Lane's testimony between the first grand jury proceeding and appellant's trial which would have affected the grand jury's decision to indict. Although at the time of the first grand jury Lane was no longer a suspect in the assault upon complainant, the indicting grand jury, through the transcript of Lane's testimony, was aware that initially he had been arrested and therefore had some interest in the outcome of the case. We are persuaded that the trial court did not err in rejecting appellant's motion to vacate sentence on this basis.

■ Regarding appellant's contention that the prosecutor withheld exculpatory evidence from the grand jury, we observe first that a prosecutor ordinarily is not obligated to present to a grand jury all evidence that is favorable to an accused.[5]

---

5. Appellant contends that the government failed to introduce the following "exculpatory" evidence: 1) that at the photo array conducted on March 29, 1979, almost 3 weeks after the crime, complainant had picked out a picture of Lane as her assailant with "90% certainty;" 2) that complainant had failed to pick out appellant from a line-up photograph, but instead picked out two other men whom she claimed had features similar to the assailant; 3) that Denise Barnes had

*United States v. Trass, supra,* 644 F.2d at 797. *See United States v. Lasky,* 600 F.2d 765, 768 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979); *United States v. Brown,* 574 F.2d 1274, 1276 (5th Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 720, 58 L.Ed.2d 704 (1978); *Boffa, supra,* 89 F.R.D. at 530; *United States v. Mandel,* 415 F.Supp. 1033, 1040 (D.Md. 1976). However, where a prosecutor is aware of substantial evidence negating a defendant's guilt which might reasonably be expected to lead a grand jury not to indict, his failure to disclose such evidence to a grand jury may lead to dismissal of the indictment. *See Ciambrone, supra,* 601 F.2d at 623; *Boffa, supra,* 89 F.R.D. at 530. *See generally* 1 ABA Standards for Criminal Justice—The Prosecution Function, § 3–3.6 (2d ed. 1980) ("no prosecutor should knowingly fail to disclose to the grand jury evidence which will tend substantially to negate guilt").

The third grand jury was informed that Lane had been present in complainant's apartment house with appellant shortly before the crime, that he had become acquainted with complainant, and that he had been identified as a suspect after the crime and had been arrested in connection with it. In addition, the grand jury was informed that complainant had been unable to identify appellant as her assailant during pretrial identification procedures.

We note that the purportedly exculpatory evidence not made known to the third grand jury was either cumulative of the evidence presented which implicated Lane, or was collateral to the issue of appellant's guilt or innocence of the charged crimes.[6] Finally, all of the purportedly exculpatory

evidence was presented to the jury at trial, and the jury, in turn, found appellant guilty beyond a reasonable doubt of two of the three charged crimes—first-degree burglary and assault with intent to commit rape.

■ In ruling on the motion to vacate sentence the trial court wrote, *inter alia,* "The way in which the government handled the presentation of defendant's case to the grand jury leaves much to be desired. However, the court cannot find that the government abused the Grand Jury process either by presenting shoddy merchandise ... or by presenting prior grand jury testimony which the government knew or had reason to know was unreliable." [citations omitted]. On the record before us, we are unable to conclude that the trial court's underlying findings of fact were plainly wrong or that its legal conclusions were erroneous. Thus, we reject appellant's contentions concerning grand jury abuse.

### III

■ Appellant's second contention arises out of the circumstances surrounding complainant's viewing of appellant in the courtroom while complainant was first being presented to the panel of prospective jurors during voir dire. Appellant contends that the trial court's admission of complainant's in-court identification of appellant violated the requirements of due process under the principles of *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) and its progeny. *See, e.g., Manson v. Brathwaite,* 432 U.S. 98, 104–14, 97 S.Ct. 2243, 2247–53, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).[7] Alternatively, appel-

---

identified Lane as the person who had come looking for complainant; 4) that the leather jacket matching the complainant's description of that worn by her assailant had been seized from Lane; 5) that Lane's "alibi" witness, Jesse Hall, did not support Lane's alibi.

6. Evidence cumulative of complainant's original implication of Lane included Denise Barnes' identification of Lane as the man who had asked to speak with complainant when complainant was in Barnes' apartment, the resem-

blance between appellant's and Lane's jackets on the night of the incident, and Jesse Hall's inability to recall whether Lane had spent time with him on the night of the incident.

7. When there is a due process challenge to an in-court identification based upon allegedly improper identification procedures, we have required the trial court to undertake two main inquiries. First, the court must determine whether the identification procedure employed was unnecessarily suggestive and conducive to

lant contends that the trial court abused its discretion in admitting the complainant's in-court identification, because it constituted evidence "so inherently weak or unreliable as to lack probative value." *See Sheffield v. United States*, 397 A.2d 963, 967 (D.C.), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2414, 60 L.Ed.2d 1071 (1979); *Reavis v. United States*, 395 A.2d 75, 78–79 (D.C. 1978). We are unpersuaded by appellant's contentions.

Shortly before trial and out of the jury's presence, the prosecutor informed the court that during jury selection complainant had spontaneously recognized appellant, who was seated at the defense table, as her assailant and that she would therefore be making an in-court identification of appellant. In response to the court's question whether the prosecutor or anyone else had previously suggested to the complainant where her assailant would be in the courtroom, the prosecutor replied:

> Your honor, to my knowledge, no one focused her attention on the table. When I had my last discussion with her which was the other day I told her I would not be seeking an in-court identification from her, however ... I told her to be alert and if she in fact did see

anyone she recognized she should let me or someone know ....

Appellant's counsel objected to the introduction of the in-court identification. He contended that complainant had failed to make any pretrial identifications of appellant as her assailant and that her courtroom identification of appellant may thus have been the product of the prosecutor's pretrial remarks. Appellant's counsel requested "a hearing as to whether [the prosecutor's conduct was] suggestive constituting a denial of due process."

The trial court initially ruled that the in-court identification appeared to be admissible under *Middleton v. United States*, 401 A.2d 109 (D.C.1979).[8] However, noting that it wished to proceed with "an abundance of caution," the court went on to hold a hearing at which complainant testified concerning what she had been told by the prosecutor about the location of persons in the courtroom prior to her recognizing appellant in the courtroom.

Complainant testified that 3 days before trial she had met with the prosecutor and Detective Terrell. She said that the prosecutor told her that she would be asked to

irreparable misidentification. *See Stovall v. Denno, supra*, 388 U.S. at 302, 87 S.Ct. at 1972; *Jennings v. United States*, 431 A.2d 552, 558 (D.C.1981), *cert. denied*, 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982); *Patterson v. United States*, 384 A.2d 663, 665 (D.C.1978). Second, if the court finds that the identification procedure was unnecessarily suggestive, it must then determine whether, in light of all the circumstances, the resulting identification was nonetheless reliable. *See Manson v. Brathwaite, supra*, 432 U.S. at 114, 97 S.Ct. at 2253; *Jennings, supra*, 431 A.2d at 558; *Patterson, supra*, 384 A.2d at 665. Typically, this two-stage inquiry is made by the court in the context of a hearing outside the jury's presence. *See Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Hurt*, 155 U.S.App.D.C. 217, 220 n. 4, 476 F.2d 1164, 1167 n. 4 (1973); *Clemons v. United States*, 133 U.S. App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

**8.** In *Middleton* a police officer, who had been assaulted by the defendant during the defendant's escape from the scene of a robbery, had

been unable to make any pretrial identifications of his assailant. However, at the lunch recess on the first day of appellant's trial, out of the presence of the jury, the officer recognized appellant in the courtroom. Following a hearing outside the presence of the jury, the court concluded that the circumstances presented "no constitutional impermissiveness" and admitted the officer's in-court identification. In rejecting appellant's due process attack on the admission of the identification, we held that "without more, the mere exposure of the accused to a witness in the suggestive setting of a criminal trial does not amount to the sort of impermissible confrontation with which the due process clause is concerned." *Id.* at 132 (footnote omitted). We further noted that "absent a constitutionally cognizable impropriety in the procedure by which the accused is exposed to the witness, the fact that such a confrontation was suggestively focused does not by itself raise a bar to the witness' identification testimony." *Id.* at 133; *see also Reavis v. United States, supra*, 395 A.2d at 78.

make an in-court identification of her assailant only if she were able to do so, and that no one had directed her to look for her assailant anywhere in the courtroom. On cross-examination, complainant elaborated that the prosecutor had told her that when she was introduced to the jury, she "may or may not" see her assailant, and that if she were to see him, she was to tell the prosecutor. She also stated that a few weeks before trial, the prosecutor took her to a courtroom and, because she had never previously been to a trial, described to her the respective locations of the judge, jury, testifying witnesses and the defense table.

Following the brief hearing held out of the presence of the jury, the trial judge stated that he credited the version of the pretrial events offered by complainant and the prosecution, and ruled that he would admit complainant's in-court identification under *Middleton, supra,* "subject to cross-examination in all [its] facets." Appellant now contends, as he did following the court's ruling at trial, that unlike the situation in *Middleton,* the prosecutor here engaged in "intentionally suggestive" pretrial efforts to obtain an identification from complainant, *see generally United States v. York,* 138 U.S.App.D.C. 197, 426 F.2d 1191 (1969); *Mason v. United States,* 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), and that consequently, as a matter of due process, the hearing should be extended to the reliability of the complainant's identification. *Jennings, supra,* 431 A.2d at 558; *Patterson, supra,* 384 A.2d at 667.

■ We cannot say that the trial court erred in its conclusion that the prosecutor's pretrial conversations with complainant did not constitute "intentionally suggestive efforts by the prosecution to obtain an initial identification." *Brown v. United States,* 327 A.2d 539, 541 (D.C.1974). The circumstances here differ somewhat from those in *Middleton, supra* and *Brown, supra,* in that in those cases the events which supposedly tainted identification took place in the courtroom without any direct involvement of the prosecutor, whereas here the prosecutor's pretrial conversations assertedly influenced complainant's identification of appellant. While our ruling here should not be viewed as sanctioning the prosecutor's actions, particularly his pointing out defense table to complainant, we discern no reason on this record to disagree with the trial court's conclusion.

Since the hearing conducted by the court led to the conclusion that there was no unnecessary suggestiveness, there was no need to extend the hearing to the issue of the reliability of the identification. *Jennings, supra,* 431 A.2d at 558; *Patterson, supra,* 384 A.2d at 667.

We add that, during trial, appellant's counsel developed fully the issues surrounding complainant's identification of appellant. The jury then evaluated the evidence of identification under the instructions of the trial judge, "the very task our system must assume juries can perform." *Watkins v. Sowders,* 449 U.S. 341, 347, 101 S.Ct. 654, 658, 66 L.Ed.2d 549 (1981).

### IV

Appellant's third contention is that the trial court abused its discretion in denying appellant's request for a missing witness instruction for Jesse Hall, whom Lane testified he was with at the time of the incident, and for Lane's mother, father, and brother, who purportedly heard appellant tell Lane that he had had sexual intercourse with complainant on the night of the assault. We find no error in the court's action.

■ In order for a party to be entitled to a missing witness instruction, the court must first determine that the requesting party has satisfied two conditions: 1) that the witness be "peculiarly available" to the party against whom the inference is sought to be made, and 2) that the witness' testimony would be likely to elucidate the transaction at issue. *See Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Thomas v. United States,* 447 A.2d 52, 57 (D.C.1982); *Cooper*

658

*v. United States,* 415 A.2d 528, 533 (D.C. 1980).

█ A witness is not peculiarly available to a party when there is a showing that his identity was known to the opposing party seeking the instruction, who thus could require his physical presence by subpoena. Nor is a witness peculiarly available to a party if, as a practical matter, the witness' testimony is expected to be hostile to that party. *See, e.g., Thomas, supra,* 447 A.2d at 57–58; *Cooper, supra,* 415 A.2d at 533 n. 11.

█ To meet the elucidation requirement, the requesting party must show that the witness' testimony would be important to the defendant's case, would be noncumulative, or would otherwise be superior to other testimony already given on the matter. *See Thomas, supra,* 447 A.2d at 57; *Cooper, supra,* 415 A.2d at 534. Appellant did not establish the existence of the preconditions—peculiar availability and elucidation—necessary to warrant missing witness instructions with regard to Jesse Hall and Lane's relatives.

With respect to Hall, appellant failed to show that Hall was either physically or practically unavailable to appellant. Moreover, the record reveals that Hall may not have been able to elucidate the transaction, *i.e.,* Lane's "alibi." According to Terrell, Hall was unable to remember whether or not Lane had visited him on the night of the incident.

With respect to Lane's relatives, to the extent that they shared with Lane an identity of interest, their testimony would have been simply cumulative of and not superior to Lane's testimony. And if, as appellant

contends, their testimony would have been unbiased and disinterested, unlike Lane's, their interests would not have been sufficiently hostile to appellant's to have rendered them practically unavailable to appellant. See *Thomas, supra; Cooper, supra.*[9] For the foregoing reasons, we find that the trial court ruled correctly in denying appellant's request for missing witness instructions. The prerequisites for such instructions were not present.

█ In so ruling, we reiterate two points made for the court in Chief Judge Newman's comprehensive discussion of the missing witness rule in *Thomas, supra.* The first is that even where the prerequisites of elucidation and peculiar availability are satisfied, the court has discretion to refuse the instructions. "This discretionary decision should be guided by reference to the underlying rationale for the doctrine, by considering 'whether from all circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one.'" *Thomas, supra,* 447 A.2d at 58 (citations omitted).

A second point made in *Thomas* was the following:

This and other recent cases illustrate that missing witness inferences are being sought, and are often permitted, in a much broader class of circumstances than the doctrine was ever meant to reach. This has occasioned numerous reversals and thus led to retrials that could easily have been avoided. The upshot is that both the court's and the parties' time and resources are expended unnecessarily. A more restrained and cautious use of the doctrine would not only be

9. In a footnote, appellant suggests that Lane's relatives were automatically rendered physically unavailable to appellant under the missing witness rule because appellant learned of their existence and identities for the first time in the course of trial. *See, e.g., Brown v. United States,* 388 A.2d 451, 459 (D.C.1978); *United States v. Stevenson,* 138 U.S.App.D.C. 10, 13–14, 424 F.2d 923, 926–27 (1970). Contrary to appellant's contentions, we have not adopted this proposition as "settled law." In many circumstances, a par-

ty may readily secure by subpoena the testimony of a witness who comes to that party's attention for the first time during trial. *See, e.g. Dent v. United States,* 404 A.2d 165, 170 (D.C. 1979); *Brown v. United States,* 134 U.S.App.D.C. 269, 271, 414 F.2d 1165, 1167 (1969) (per curiam); *Wynn v. United States,* 130 U.S.App.D.C. 60, 64–65 n. 23, 397 F.2d 621, 625–26 n. 23 (1967). We are not persuaded that, under the circumstances here, members of witness Lane's family were unavailable to appellant.

truer to its underlying rationale, but would decrease the unnecessary burden on the judicial system that results from its abuse.

*Thomas, supra,* 447 A.2d at 60 (citations omitted).

While phrased in terms that apply specifically to missing witness inferences urged by the prosecution, our statement in *Thomas* has application to defense requests as well, and reinforces our conclusion that the appellant's missing witness argument here is without merit.

## V

■■■ Appellant's next contention is that the trial court abused its discretion in admitting Detective Terrell's testimony that she had spoken over the telephone with appellant prior to his arrest and that he had agreed to come to the police station to give a statement about the incident, but never appeared. Assuming without deciding that the government failed to lay a proper foundation that the recipient of the phone call had actually been appellant, *see, e.g., United States v. Johnston,* 318 F.2d 288, 292 (6th Cir.1963), we are satisfied that any error in the admission of the testimony was harmless. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Terrell's testimony was on a matter entirely collateral to appellant's guilt of the charged offenses. Neither counsel referred to this testimony in closing argument. The jury was not instructed by the court on the evidence, either as it may have manifested appellant's consciousness of guilt or otherwise. Appellant waited until just before closing arguments to object to the admission of the statement, thereby depriving the government of the opportunity to have corrected any error in a timely manner by attempting to lay an adequate foundation. Finally, the government's evidence of appellant's guilt was weighty. For the foregoing reasons, we are convinced that the jury's verdict was not "substantially swayed" by the error. *Id.*

## VI

Appellant's final contention is that the prosecutor improperly commented in his closing argument upon appellant's failure to testify at trial, infringing upon his Fifth Amendment rights. Appellant isolates the following remark as improper:

If he [George Lane] was lying, why would he say that it was Kelvin Miles that was with him? No evidence of any animosity or hate. He says he was his friend. If he was lying, I submit you wouldn't tell them the name of a real person, Kelvin Miles, that they could go and find. *A real person if he gave them that name might be able to conclusively disprove George Lane's allegation. He might be able to prove he was in a hospital.*

TR. 536–36 (emphasis supplied). We are not persuaded by appellant's contention.

■■■ In order to determine whether a prosecutor improperly commented upon a defendant's silence at trial, we must determine whether the prosecutor's statements "were manifestly intended or [were] of such character that the jury would naturally and necessarily take [them] to be a comment on the failure of the accused to testify." *Wright v. United States,* 387 A.2d 582, 584 (D.C.1978); *Brown v. United States,* 383 A.2d 1082, 1085 (D.C.1978). We do not regard the remarks challenged here either as demonstrating the prosecutor's intent to deprive appellant of a fair trial or as directly and unambiguously drawing the jury's attention to appellant's failure to testify. Rather, we observe that on their face these remarks were plainly the prosecutor's attempt to place the credibility of George Lane in a favorable light. They amount to a suggestion to the jury that, if Lane had set out to lie to the police about another's involvement in the incident to the police, it would have been in Lane's best interest to have provided the police with a fictitious name, in order to avoid the risk that the person named would later

contradict Lane's version of the events.[11] We are therefore satisfied that a reasonable juror would not have naturally and necessarily interpreted the prosecutor's remarks as comments on appellant's silence at trial. *See Wright, supra.* In view of the foregoing, the judgment and order on appeal are

*Affirmed.*

11. Appellant's counsel seemed to recognize this plain meaning of the prosecutor's remarks when in his closing argument, he remarked to the jury:

Now, Mr. Stanley said this. He says that George Lane—if he is really covering up here, why doesn't he give the police the fictitious name? He is free. He doesn't have to. But Mr. Stanley is missing an important fact. Isn't he? That when Mr. Lane first gave the name he wasn't free.

Now, is that going to help him get off the hook, ladies and gentlemen? You decide for yourself.

TR. II, 577.