*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CO-0555

JESSE R. REDMOND, JR., APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(1996-FEL-001054)

(Hon. Marisa J. Demeo, Motions Judge)

(Argued May 16, 2023                    Decided July 31, 2025)

*David H. Reiter* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of argument, and *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and HOWARD, *Associate Judges*, and THOMPSON, *Senior Judge*.

BECKWITH, *Associate Judge*: A jury convicted Jesse R. Redmond, Jr., of

sexually assaulting his neighbor.[1]  Mr. Redmond now appeals the denial of his motion to vacate his conviction, in which he claimed that the government knowingly introduced false or misleading evidence by allowing an expert witness to testify that a hair found at the crime scene "was consistent with that of Mr. Redmond's."  Mr. Redmond argues that the trial court erred in ruling that this expert witness's testimony was not material to the jury's verdict.  The government counters that the correct standard of harmless error review is that which is generally applicable to constitutional errors identified in federal habeas corpus proceedings under the Supreme Court's decision in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and under that standard, the hair testimony did not have a "substantial and injurious effect" on the jury's verdict—in other words, that Mr. Redmond was not "actually prejudiced" by the testimony.  *See id.* at 637.  We reject the government's contention that, because Mr. Redmond challenged the knowing presentation of false or misleading testimony through a post-conviction motion under D.C. Code § 23-110, the government should have benefited from the more lenient harmless error standard of *Brecht* as opposed to the stricter harmless-beyond-a-reasonable-doubt standard applicable to constitutional errors on direct appeal.  *See Chapman v. California*, 386 U.S. 18 (1967).  Applying the stricter standard, we conclude that there was a

---

[1] Mr. Redmond was charged with first-degree sexual abuse under D.C. Code § 22-4102(1) (1981), which is now codified at D.C. Code § 22-3002.

reasonable possibility that the expert witness's testimony about tangible evidence that she said placed Mr. Redmond at the scene of the crime affected the jury's verdict. We therefore vacate his conviction and remand for a new trial.

## I. Background

We incorporate the facts as set forth in our opinion resolving Mr. Redmond's direct appeal but briefly summarize them here. *Redmond v. United States*, 829 A.2d 229, 230-33 (D.C. 2003). Mr. Redmond was accused of assaulting B.R., his neighbor and family friend of nearly thirty years. *Id.* at 230-31. A detective testified at trial that Mr. Redmond acknowledged visiting B.R.'s house three times the morning of the alleged assault, twice to speak to B.R.'s granddaughter and the third time to fix one of B.R.'s locks. B.R. testified that during the final visit, Mr. Redmond sexually assaulted her in her bedroom, describing acts of forced vaginal, anal, and oral sex. The next day, B.R. told her granddaughter what had happened, her granddaughter called the police, and B.R. identified Mr. Redmond as her assailant when they arrived. B.R. was subsequently examined in a hospital, where a doctor noted scratches in and around her vagina and conducted a rape kit. *Id.* A single sperm cell recovered during the examination was too small a specimen to be tested, and police also found no usable fingerprints placing Mr. Redmond in B.R.'s bedroom. The government's final witness did, however, testify as to forensic

evidence—a pubic hair recovered from B.R.'s bedsheet—that placed Mr. Redmond in B.R.'s bedroom.  Federal Bureau of Investigation (FBI) forensic examiner Karen Lanning testified that there was "one hair that was consistent with that of Mr. Redmond[]," that she "looked at all the characteristics of the hair, the known sample [from Mr. Redmond] and the questioned hair [from the bedsheet]," and that "it contained all the same characteristics."

At the conclusion of all the evidence and closing arguments, the jury deliberated for two days before indicating it was deadlocked. The court gave the jury an anti-deadlock instruction, and after another full day of deliberations, the jury acquitted Mr. Redmond of two counts of first-degree sexual abuse alleging forced oral and anal sex and found him guilty of a third count involving vaginal penetration. The jury was sent back to further deliberate after the court polled the jury and one juror disagreed with the guilty verdict.  Two hours later, the jury returned and polled unanimously on the single count of conviction.

Mr. Redmond filed a motion under D.C. Code § 23-110 arguing that the government violated his due process rights by knowingly presenting false or misleading evidence during the forensic examiner's testimony regarding the hair

analysis.[2] *See Napue v. Illinois*, 360 U.S. 264 (1959). The government did not contest that the expert's testimony was false or misleading or that the government should have known this at the time of the trial[3] but argued that Mr. Redmond was not entitled to relief because the testimony was not material to the verdict. The motions court agreed with the government and denied Mr. Redmond's motion. Mr. Redmond now appeals that ruling.

---

[2] During the pendency of his direct appeal, Mr. Redmond filed a § 23-110 motion alleging ineffective assistance of counsel for failing to request DNA testing on the hair from the bedsheet and the sperm cell from the rape kit, and the trial court ordered testing on the hair. The mitochondrial DNA testing results indicated that Mr. Redmond "cannot be excluded as the source" of the hair. Mr. Redmond subsequently abandoned the § 23-110 motion, and our court did not consider it on direct appeal. *Redmond*, 829 A.2d at 230 n.1.

[3] The government stated in its opposition to Mr. Redmond's § 23-110 motion that "out of an abundance of caution, and in the interests of justice," it would proceed in this case as it has in others—not including this one—in which the Department of Justice found that microscopic hair comparison analysis "exceeded the limits of science." The government stated that it would "waive procedural and time-barred defenses to claims for collateral relief" and would "not contest that the evidence was false or misleading or that the government as a whole should have known that it was false or misleading." This is notwithstanding the DNA lab report's statement that "the [mitochondrial ]DNA sequences obtained from [the hair cell] and [Mr. Redmond's blood] are the same." Accordingly, in this opinion, we do not analyze whether the expert's testimony was actually false or misleading and do not consider whether Mr. Redmond's motion was successive in any respect.

## II. Analysis

### A.        Legal Framework and Standard of Review

"*Napue* violations require a two-factor showing that: (1) the government knowingly produced or allowed to go uncorrected[] false or misleading evidence; and (2) the false or misleading evidence was material to the verdict."[4] *United States v. Nelson*, 217 A.3d 717, 722 (D.C. 2019). As noted *supra*, the government has expressly waived all procedural and time-barred defenses, does not contest that the expert's testimony was false or misleading, does not contest that the government should have known this at the time of the trial, and concedes that "the sole issue is whether the alleged error was material" to the verdict. That decision accords with the National Research Council's conclusion that microscopic hair comparisons are subjective and unreliable because "[t]he categorization of hair features depends heavily on examiner proficiency and practical experience," there are "no uniform standards on the number of features" that must be similar between two hairs "before an examiner may declare a 'match,'" and "[n]o scientifically accepted statistics exist

---

[4] Throughout this opinion, we refer to *Napue* violations interchangeably as violations involving false, misleading, or perjured testimony. *See Longus v. United States*, 52 A.3d 836, 847-48 (D.C. 2012) ("It is well established that the government's obligation extends to the correction of not only perjurious testimony, but also to testimony that is 'false' or 'misleading.'" (internal citations and footnotes omitted)).

about the frequency with which particular [features] of hair are distributed in the population." Nat'l Rsch. Council, *Strengthening Forensic Science in the United States: A Path Forward* 156, 160 (2009). In fact, prompted in part by those findings from the National Research Council, the Department of Justice reviewed thousands of cases that involved hair comparison evidence from the FBI and determined that hair analysts made errors in more than ninety percent of them. Press Release, U.S. Dep't of Justice, FBI Testimony on Microscopic Hair Analysis Contained Errors in at Least 90 Percent of Cases in Ongoing Review (April 20, 2015), https://www.fbi.gov/news/press-releases/fbi-testimony-on-microscopic-hair-analysis-contained-errors-in-at-least-90-percent-of-cases-in-ongoing-review; https://perma.cc/4H28-6S93. Such hair analyses are thus "deficient as a means of making positive identifications," *Jones v. United States*, 202 A.3d 1154, 1162 (D.C. 2019), and Ms. Lanning's testimony that the hair she analyzed was consistent with Mr. Redmond's hair was false or misleading under *Napue*.

As to the second prong, although we address later the government's argument that a *Napue* claim raised in a § 23-110 motion is not reversible if it is harmless under a more lenient standard for assessing harm, *see infra* Part II.C, under the materiality standard inherent to a *Napue* error, "a new trial is warranted so long as the false testimony 'may have had an effect on the outcome of the trial'—that is, if it 'in any reasonable likelihood could have affected the judgment of the jury.'"

*Glossip v. Oklahoma*, 604 U.S. ----, 145 S. Ct. 612, 626-27 (2025) (brackets omitted) (first quoting *Napue*, 360 U.S. at 272; and then quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972)); *see also Jones*, 202 A.3d at 1166.  In stating this materiality standard, we have referred to both a "reasonable likelihood" and a "reasonable possibility" that the falsehood affected the verdict, but "there is no substantive difference in these formulations."  *Woodall v. United States*, 842 A.2d 690, 696 & n.6 (D.C. 2004).  Both are "equivalent to that standard applicable to constitutional errors" under *Chapman v. California*, 386 U.S. 18 (1967)—that is, harmless "beyond a reasonable doubt."  *Mitchell v. United States*, 101 A.3d 1004, 1008 (D.C. 2014) (citing *United States v. Bagley*, 473 U.S. 667, 679-80 & n.9 (1985)); *see Glossip*, 145 S. Ct. at 627.

Although Mr. Redmond and the government disagree about who bears the burden with respect to the materiality prong of a *Napue* violation, this court has already held that "[o]nce the appellant has made sufficient demonstration of uncorrected false testimony[,] then the burden shifts to the government."  *Mitchell*, 101 A.3d at 1008; *accord Longus v. United States*, 52 A.3d 836, 845 (D.C. 2012) ("[W]e must conclude that appellant's due process rights were violated necessitating a new trial if . . . the government cannot show, beyond a reasonable doubt, that the false testimony was harmless in the context of appellant's trial."); *see also Glossip*, 145 S. Ct. at 627 ("In effect, this materiality standard requires '*the beneficiary of the*

*constitutional error* to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (emphasis added) (brackets omitted) (quoting *Bagley*, 473 U.S. at 680 n.9, which is in turn quoting *Chapman*, 386 U.S. at 24)).[5]  "[O]ur determination of materiality is de novo based on our 'own

---

[5] The government points to *Powell v. United States* for its statement that "[a]nalogous to *Brady*," which is a related claim discussed further *infra* at Part II.C., "the burden is on the appellant to demonstrate that he is entitled to relief." 880 A.2d 248, 257 (D.C. 2005). We find that case to be inapposite, and the same is true of *O'Brien v. United States*, 962 A.2d 282 (D.C. 2008), a case that the government did not cite but that has also been discussed in this context. *See Jones*, 202 A.3d at 1167. In both *Powell* and *O'Brien*, the parties did not contest the issue in their briefing, and the court simply assumed, without analysis, that the defendant bore the burden. *Powell*, 880 A.2d at 257; *O'Brien*, 962 A.2d at 315. "A point of law merely assumed in an opinion, not discussed, is not authoritative." *District of Columbia v. Bryant*, 307 A.3d 443, 450-51 (D.C. 2024) (quoting *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994)). The *Powell* court stated that the appellant bears the burden based solely on a citation by analogy to *Strickler v. Greene*, 527 U.S. 263 (1999), a *Brady* case, which, as we discuss *infra*, is analytically different from *Napue* cases. *Powell*, 880 A.2d at 257. Similarly, the *O'Brien* court relied on just one other case, *Card*, which lacked both precedential authority, having been vacated, and persuasive value, as it summarily stated the burden with citations only to *Napue* and a Fourth Circuit case that discusses the defendant's burden as to the *first* prong. *O'Brien*, 962 A.2d at 315 (citing *Card v. United States*, 776 A.2d 581, 602 (D.C. 2001), *opinion vacated, appeal dismissed,* 863 A.2d 821 (D.C. 2004)). In addition, the *O'Brien* court explicitly resolved the *Napue* claim on the first prong, so its discussion of materiality is dicta. *Id.* at 315-16.

By contrast, the *Mitchell* court was squarely presented with this question in the briefing and affirmatively decided that *Longus* had correctly characterized the burden as belonging to the government. *Mitchell*, 101 A.3d at 1008. There is reason to think that the court in *Mitchell* was aware of and did not view as precedential the statements in *O'Brien* and *Powell*, especially considering that *Mitchell* cited *O'Brien* in relation to the materiality standard and was authored by the same judge as *Powell*.

independent examination of the record,' including the 'evidentiary basis' of the lower court's ruling." *Jones*, 202 A.3d at 1167-68 (quoting *Napue*, 360 U.S. at 271-72).

## B.     Materiality of Ms. Lanning's Testimony

In determining whether the government has shown that there is no reasonable possibility that Ms. Lanning's testimony affected the verdict, we must "assess the 'probable impact [of the tainted evidence] on the minds of an average jury.'" *Nelson*, 217 A.3d at 722-23 (quoting *Derrington v. United States*, 488 A.2d 1314, 1331 (D.C. 1985)). To do so, "we must determine the importance of the false testimony in the context of the trial, the extent to which the credibility of the witness was impeached, and the independent evidence of the defendant's guilt." *Id.* (citing *Hawthorne v. United States*, 504 A.2d 580, 591 (D.C. 1986)). The motions court determined that Ms. Lanning's testimony was "not important enough" to affect the verdict because Ms. Lanning admitted that "hair is not a positive means of personal identification," her testimony was "brief," and the prosecutor did not focus on it in her closing

---

*Mitchell*, 101 A.3d at 1007-08 & n.4. For all of these reasons, we conclude that *Mitchell* is our binding precedent on this point. *See Parker v. K & L Gates, LLP*, 76 A.3d 859, 880 (D.C. 2013) (McLeese, J., concurring) (explaining that in that case, where there was "a perceived conflict between the holding of an earlier decision and the holding of a later decision that has expressly addressed the earlier decision," it was proper to follow the later decision where (1) the earlier decision may have been dicta and (2) the later decision was "clearly correct as an original matter").

argument, instead emphasizing the "non-hair evidence" and making only a "brief reference" to Ms. Lanning's testimony. The court also found that Ms. Lanning had been subjected to a rigorous cross-examination and that there was overwhelming independent evidence of Mr. Redmond's guilt—specifically, B.R.'s identifications and Mr. Redmond's statement placing him at B.R.'s house on the day of the offense. We think the record presents a much closer question.

As an initial matter, we note that Ms. Lanning's role as an expert forensic witness already makes her testimony significantly more likely to affect and potentially mislead the jury. We have long recognized that "the authoritative quality which surrounds expert opinion . . . might be given undue deference by jurors." *Smith v. United States*, 389 A.2d 1356, 1359 (D.C. 1978). The inherent persuasiveness of expert testimony owes in part to a perceived "infallibility" of forensic evidence among lay audiences. *See Jones*, 202 A.3d at 1169 n.44 ("The tendency of testimony on scientific techniques to mislead the jury relates to the fact that, because of the apparent objectivity of opinions with a scientific basis, the jury may cloak such evidence in an aura of mystic infallibility." (quoting *United States v. Smith*, 869 F.2d 348, 352 (7th Cir. 1989))); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995) (explaining that "a jury more readily accepts the opinion of an expert witness as true simply because of his or her designation as an expert" and that this "potentially prejudicial influence" is

exacerbated by the "difficulty inherent in evaluating scientific evidence" such that "'ostensibly scientific testimony may sway a jury even when as science it is palpably wrong'" (quoting Bert Black et al., *Science and the Law in the Wake of* Daubert*: A New Search for Scientific Knowledge*, 72 Tex. L. Rev. 715, 789 (1994))); *see also* Vincent P. Iannece, *Breaking Bad Science: Due Process as a Vehicle for Postconviction Relief When Convictions Are Based on Unreliable Scientific Evidence*, 89 St. John's L. Rev. 195, 199-200 (2015) (discussing the "Reverse CSI Effect," whereby jurors expect damning forensic proof of guilt, hear expert testimony on the subject, and then "place too much weight on the forensic evidence" that is produced, even if it would not properly be considered strong enough to result in a conviction). As a result, "we cannot underestimate the weight that juries give to forensic evidence." *Gardner v. United* States, 999 A.2d 55, 63 (D.C. 2010).

And an expert's recognition of the scientific limitations of her conclusion does not necessarily make that conclusion less compelling in the eyes of the jury.[6] *See*

---

[6] Indeed, a witness's credibility may improve when they acknowledge the weaknesses in their testimony or limits of their knowledge. *See, e.g.*, Joel A. Dvoskin & Laura S. Guy, *On Being an Expert Witness: It's Not About You*, 15 Psychiatry, Psych., & L. 202, 209 (2008) ("If a point is in favor of the opposing side, wise and effective experts concede it gladly . . . . In our experience, jurors are most likely to believe experts who are willing to admit their limitations and ignorance."); Stanley L. Brodsky et al., *Temptations for the Expert Witness*, 45 J. Am. Acad. Psychiatry L. 460, 461 (2017) (explaining that "[i]t is a mistake to think that being

*Jones*, 202 A.3d at 1169. In *Jones*, the hair expert acknowledged "that microscopic hair comparisons were 'not like a fingerprint' and 'not a basis for absolute personal identification,'" but the court still held that those statements "did little to detract from [the hair expert's] seemingly impressive real life forensic experience," his testimony about the rarity of finding similar hairs from different people, and his "unrefuted" conclusion that the questioned hair was "consistent with" the defendant's. *Id.* at 1161, 1168-69; *see Nelson*, 217 A.3d at 725 (explaining that although the testimony that hair analysis was not as definitive as fingerprint evidence "potentially minimized [the expert's] false testimony, it in no way neutralized it or gave the jury a basis to discredit it").

Here, Ms. Lanning, like the witness in *United States v. Nelson*, "appeared to be an extremely knowledgeable and trustworthy expert witness," *id.* at 726, given the unimpeached discussion of her training and employment with the FBI, her multiple experiences testifying as an expert in hair analysis, and her explanation of how hair and fiber analysis works.[7] Ms. Lanning agreed that hair analysis could not

---

a know-it-all will increase credibility" because "quite the opposite is true" and "[i]nstead, effective experts admit what they don't know with composure and ease").

[7] The government argues that Ms. Lanning's authoritativeness was limited because she was at the FBI for just one year, testified only in Kansas state cases, and did not have an advanced degree. These details—especially the location of her previous testimony and work—are not factors that would meaningfully undermine

positively identify an individual and acknowledged that it was not as definitive as DNA testing or fingerprinting, but she reiterated what she could and did determine—that the hair found on B.R.'s bedsheet was "consistent" with Mr. Redmond's hair.[8] The defense's cross-examination of Ms. Lanning was not powerful enough to undermine the apparent reliability of this conclusion. *See, e.g.*, *id.* at 1161 (noting that the cross-examination of the expert, while competent, failed to "make a meaningful dent" in the expert's conclusion that the hairs in question were consistent and that it was rare to find hairs from different people that were indistinguishable). Ms. Lanning also testified on direct and on cross that in her experience, the hairs she analyzes are consistent "approximately ten percent of the time," a point that the

---

her authority in the eyes of the jury. She was admitted as an expert without objection and was not cross-examined on her supposed lack of experience. Even if, as the government argues, Ms. Lanning had less experience than the experts in *Nelson* and *Jones*, the jury could not make that comparison, as Ms. Lanning was the only hair expert to testify. *See Satterwhite v. Texas*, 486 U.S. 249, 259 (1988) (noting that the expert's "testimony stands out" particularly since he "was the only psychiatrist to testify on this issue").

[8] Ms. Lanning testified that although "hair is not a positive means of personal identification," she could "determine whether or not the questioned hair has the same characteristics of the known sample and thus is consistent with originating from the known sample" "by comparing all of these characteristics in the questioned hair to the known sample in the same field of view using [her] comparison microscope." She could not "say that the hair is positively that of Mr. Redmond's" but that it was "consistent with originating from him." "Hairs can look the same," she stated, adding that "other examiners in the FBI Laboratory have not been able to distinguish two samples of hairs" coming from two different people, but she "personally ha[d] not seen it" happen.

prosecutor later highlighted to suggest that this was a rare conclusion to reach and so was very likely correct. As in *Jones* and *Nelson*, "the jury did not have to find [Ms. Lanning's] hair comparison 'conclusive' to find it very reliable indeed." *Jones*, 202 A.3d at 1169.

Ms. Lanning's forensic conclusion was also central to the government's storyline, and the prosecutor framed the case against Mr. Redmond so as to maximize the effect of that conclusion on the jury. In her opening statement, the prosecutor began by walking the jury through the events of the day in question and then stated that a single pubic hair recovered from B.R.'s bedroom was found by "the FBI hair and fiber examiner" to be "consistent with pubic hair . . . pulled from Mr. Redmond." Ms. Lanning then testified as the government's last witness, so her testimony was fresh in the jurors' minds as they began their deliberations. *See, e.g.*, *Satterwhite*, 486 U.S. at 259-60 (emphasizing that the expert "was the State's final witness" in determining that it was "impossible to say beyond a reasonable doubt that [his] expert testimony on the issue . . . did not influence the sentencing jury"); Am. Prosecutors Rsch. Inst., *Basic Trial Techniques for Prosecutors* 4 (2005) ("A[] . . . more dramatic method is to start and end the case in chief with your strongest witnesses, saving your best piece of evidence for last.").

The government's closing argument mirrored its opening statement, describing the assault first and then promptly invoking the hair testimony: "And what else do we know about this bedroom, ladies and gentlemen? Something was left on the sheet. . . . A pubic hair consistent with Mr. Redmond's pubic hair samples." The prosecutor also emphasized the rarity of Ms. Lanning's conclusion, saying, "And remember what Karen Lanning told us, that she found consistencies between a known and an unknown only ten percent of the time, and in this case, she found that consistency." *See Jones*, 202 A.3d at 1169 ("The prosecutor knew what he was doing when . . . he urged the jurors to credit the eyewitness identifications because it would have been so 'remarkable' for [the hair expert's] finding of a match to be wrong."). That the prosecutor emphasized the hair analysis evidence as corroborative of B.R.'s testimony and identification directly on the heels of her description of the offense signifies that Ms. Lanning's testimony was one of the most damning pieces of evidence in the government's theory of the case. *See Nelson*, 217 A.3d at 724 ("A prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was meant to be, and was, prejudicial." (quoting *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004))).

Finally, the other evidence of Mr. Redmond's guilt was not "so overwhelming . . . [as] to sufficiently mitigate any negative effect of the tainted evidence." *Nelson*,

217 A.3d at 723. In contrast to the hair testimony, no fingerprint analysis tied Mr. Redmond to B.R.'s bedroom,[9] and the prosecutor made very little of the single sperm cell recovered in the rape kit, noting in her opening statement that "there were not enough semen cells for the FBI to complete their DNA test" to identify the contributor of that cell. B.R.'s granddaughter never testified to seeing or hearing Mr. Redmond in B.R.'s bedroom, and Mr. Redmond's admission to a police officer that he had visited B.R.'s house several times that day did not suggest he had entered her bedroom. Without Ms. Lanning's hair analysis, then, only B.R.'s own testimony placed Mr. Redmond in her bedroom that day.

And as to B.R.'s testimony, the jury rejected a very significant aspect of B.R.'s description of the assault when it acquitted Mr. Redmond on two of the three sexual assault charges. That the jury was deadlocked for some time also tends to undermine the characterization of the government's evidence as overwhelming. *See, e.g.*, *Koonce v. United States*, 993 A.2d 544, 557 (D.C. 2010) ("[T]he government's case was not particularly strong, as evidenced by the fact that [the defendant] was

---

[9] The dollar bill that Mr. Redmond allegedly left on B.R.'s bedroom dresser— which was recovered by police from the living room coffee table, not the bedroom— had no usable fingerprints, and no fingerprinting was ever conducted on the bedroom. As the forensic technician testified, "it was known that [Mr. Redmond] spent time in the house," although "that information did not include [Mr. Redmond] spending time in [B.R.'s] bedroom."

acquitted of one count and the jury deadlocked on two."). Other aspects of B.R.'s testimony raised questions about her general credibility and ability to comprehend what was taking place. For one thing, as we discussed in Mr. Redmond's direct appeal, B.R. had difficulty identifying Mr. Redmond in the courtroom, and although her in-court identification of him ultimately "clear[ed] the constitutional hurdle" of reliability, it was still open to be "scrutinized in all respects by the jury." *Redmond*, 829 A.2d at 235. B.R.'s apparent inability to recognize Mr. Redmond, a man she had known for decades, gave the jury a sound basis for questioning B.R.'s credibility: She required two separate attempts that both involved her stepping down from the witness box to move closer and displayed continued uncertainty on the third attempt when she tentatively pointed out Mr. Redmond sitting at the defense table because she "th[ought]" he "look[ed]" like Jesse Redmond." *See Robinson v. United States*, 797 A.2d 698, 706 (D.C. 2002) (describing how it was "within the province of the jury to believe or disbelieve" witnesses and to "reasonably determine [whether] such an identification was possible"); *Graham v. United States*, 12 A.3d 1159, 1164 (D.C. 2011) (noting that considerations of "inconsistent or contradictory evidence . . . are best left to the jury for determining credibility" (quoting *Adams v. United States*, 883 A.2d 76, 85 n.17 (D.C. 2005)) (brackets and internal quotation marks omitted)). B.R. appeared confused at other times during the trial as well—

she incorrectly denied ever identifying Mr. Redmond to the police out of court,[10] and she stated that Mr. Redmond came to her house on the day of the assault only twice, when it was actually three times. B.R. repeatedly struggled to understand the prosecutor's questions, particularly as they related to the timeline of Mr. Redmond's visit and her next sighting of him after the assault. Given the puzzling aspects of B.R.'s testimony, it is reasonably possible that a jury otherwise disposed to doubt parts of her telling of events relied on the hair testimony as a powerful corroboration of her accusation against Mr. Redmond and of the government's overall theory. *See Jones*, 202 A.3d at 1157 ("This expert testimony bolstered the identification of appellant as the perpetrator, which was the central issue in dispute at trial.").

The government argues that Mr. Redmond's conviction was supported by "overwhelming, independent evidence" based on the "at least four times" that B.R. "unequivocally identified [Mr.] Redmond" out of court, Mr. Redmond's "odd and unprecedented" behavior in visiting B.R.'s house multiple times on the morning of the offense, and the medical evidence that a rape occurred. We do not agree that this evidence would have been "overwhelming" to the jury. First, the impact of B.R.'s

---

[10] Two other witnesses testified that B.R. identified Mr. Redmond as her assailant to the police the day after the assault. *Redmond*, 829 A.2d at 236 & n.10. Although we previously held that this inconsistency does not "amount to a repudiation" of the show-up identification, *id.* at 236 n.9, it remains relevant to the jury's perception of B.R.'s testimony.

out-of-court identifications was likely diminished by her own failure to recollect one of those identifications while testifying and her struggle to identify Mr. Redmond in court. Second, the jury could have been persuaded both by the testimony of B.R.'s granddaughter—emphasized in Mr. Redmond's closing argument—that she was not frightened by Mr. Redmond's visits to the house and by defense counsel's argument that Mr. Redmond's neighborliness in fixing a lock for an older neighbor and longtime family friend was not strange. Finally, none of the medical evidence directly implicated Mr. Redmond. The pieces of evidence that the government highlights may support inferences of Mr. Redmond's guilt if the jury regarded them as true or accepted the government's narrative, but "we cannot say that the strength of this evidence overwhelmed [Ms. Lanning's] unimpeached, false expert testimony" directly tying Mr. Redmond to the bedroom where the assault occurred. *Nelson*, 217 A.3d at 725.

Ultimately, "[s]ubtracting the hair comparison testimony, the evidence in this case provided a number of reasons (many of them explicitly urged on the jury by defense counsel) the jury might have doubted" that Mr. Redmond was guilty of this offense. *Jones*, 202 A.3d at 1169; *cf. Roundtree v. United States*, 581 A.2d 315, 345 (D.C. 1990) ("We must remember that if only a single juror holds out for acquittal, there can be no verdict of guilty."). The government therefore has not proven that the admission of Ms. Lanning's false or misleading testimony was harmless beyond

a reasonable doubt.

### C.     Additional Harmlessness Review Under *Brecht v. Abrahamson*

Ordinarily, our conclusion that the government knowingly presented false or misleading testimony that was material under *Chapman v. California* would end our inquiry. The government argues, however, that affirmance is nonetheless required if the government can show[11] that the admission of the hair testimony did not have "substantial and injurious effect or influence in determining the jury's verdict." This proposed formulation is the *Kotteakos* harmlessness standard applicable to *non*constitutional errors, which the Supreme Court in *Brecht v. Abrahamson* held should apply to certain constitutional claims presented on collateral review in federal courts. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Supreme Court has not held that *Brecht* applies to *Napue* claims raised on habeas, and federal appellate courts that

---

[11] At oral argument, the government acknowledged that contrary to its contention—rejected above—that the defendant has the burden to prove materiality in a *Napue* claim, its argument on this point is that the government would have the burden to establish harmlessness under the *Kotteakos* standard if this court decided that *Brecht* applies to *Napue* claims arising in collateral proceedings under D.C. Code § 23-110.

have considered this question under federal habeas statutes are split.[12]  Here in the

District of Columbia, where we apply our own habeas statute and lack the concerns

about state-federal comity that animated the Supreme Court's decision in *Brecht*,

this court has not applied *Kotteakos* to our collateral review of any constitutional

errors normally subject to *Chapman* review,[13] much less to our collateral review of

*Napue* violations,[14] which arguably have a superior claim to a more stringent

materiality standard.  *See, e.g.*, *Haskell*, 866 F.3d at 151-52.  Neither *Brecht*'s

reasoning nor the various rationales posited by the government persuade us to make

it harder to establish the harmfulness of constitutional error in a whole range of cases

---

[12] *Compare Haskell v. Superintendent Greene SCI*, 866 F.3d 139, 150-51 (3d Cir. 2017) (*Brecht* does not apply), *Drake v. Portuondo*, 553 F.3d 230, 241 & n.6 (2d Cir. 2009) (*Brecht* does not apply), *and Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc) (*Brecht* does not apply), *with Gilday v. Callahan*, 59 F.3d 257, 268 (1st Cir. 1995) (*Brecht* applies), *Rosencrantz v. Lafler*, 568 F.3d 577, 589 (6th Cir. 2009) (*Brecht* applies), *United States v. Clay*, 720 F.3d 1021, 1026 (8th Cir. 2013) (*Brecht* applies), *Mitchell v. Gibson*, 262 F.3d 1036, 1062 n.13 (10th Cir. 2001) (*Brecht* applies), *and Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1111-12 (11th Cir. 2012) (*Brecht* applies).

[13] *See, e.g.*, *Haley v. United States*, 799 A.2d 1201, 1214 (D.C. 2002) (holding harmless beyond a reasonable doubt the motions court's error in failing to address a Fifth Amendment argument raised in a § 23-110 motion); *Pinkney v. United States*, 851 A.2d 479, 496 & n.23 (D.C. 2004) (assuming "for convenience and without deciding the point" that *Chapman* applies to the error raised in the § 23-110 motion).

[14] *See, e.g.*, *Mitchell*, 101 A.3d at 1008 (stating, as to a § 23-110 motion raising a *Napue* claim, that "the burden of showing harmlessness is on the government rather than the appellants and harmlessness must be proven by the constitutional standard of beyond a reasonable doubt").

to which we have not applied *Brecht* in the more than thirty years since the Supreme Court decided it.

## 1.    An Overview of Habeas and *Brecht*

An individual convicted of a crime may file a petition for writ of habeas corpus to seek relief from the conviction if it violates the law or federal constitutional rights.  Micah S. Quigley, *What Is Habeas?*, 173 U. Pa. L. Rev. 453, 455 (2025). The statute under which Mr. Redmond filed his motion, D.C. Code § 23-110, provides our local habeas procedures.  Normally, state prisoners whose post-conviction relief efforts are unsuccessful in the state court may file petitions for federal habeas relief under 28 U.S.C. § 2254, but our habeas statute "treats D.C. prisoners differently from other 'state prisoners'" because they cannot avail themselves of federal habeas proceedings once all state remedies have been exhausted. *(Wallace) Mitchell v. United States*, 80 A.3d 962, 977 (D.C. 2013).  Our post-conviction relief thus operates separately and apart from all federal proceedings.

*Brecht* held that the harmlessness standard should be more demanding of defendants on federal habeas review than it is on direct review and adopted the standard derived from *Kotteakos v. United States*, 328 U.S. 750 (1946).  *Brecht*, 507 U.S. at 622-23.  The Court justified this standard because unlike direct review,

collateral review was not meant to serve as "the principal avenue for challenging a conviction," and "it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review." *Id.* at 633, 636. By imposing a heightened burden on the defendant seeking the "extraordinary remedy" of habeas, the Court sought to protect the "interest in the finality of convictions," the importance of "comity and federalism," and the integrity of the trial by discouraging habeas petitioners from relitigating their claims on collateral review. *Id.* at 633-37.

Several of these principles have no applicability to the District's unique habeas scheme. For one, principles of federalism and comity are not relevant, as the government acknowledges, because the District of Columbia's judiciary is not "frustrate[d]" by "[f]ederal intrusions into [its] criminal trials" through federal collateral review. *Brecht*, 507 U.S. at 635 (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)). There is no duplication of *Chapman* review between this court and federal habeas courts because D.C. prisoners cannot seek habeas relief in federal courts and no duplication between direct appeal and collateral review because *Napue* claims are generally addressed for the first time in a § 23-110 motion. *See, e.g.*, *Jones*, 202 A.3d at 1157 (*Napue* claim raised on § 23-110 motion); *Nelson*, 217 A.3d at 719 (same); *Mitchell*, 101 A.3d at 1009 (same); *see also Glossip*, 145 S. Ct. at 623 n.4 (2025) (explaining that the defendant seeking state habeas relief had no occasion

to raise his *Napue* claim on direct appeal); *Haskell*, 866 F.3d at 151 ("A defendant will usually be unable to litigate his claims of perjured testimony at 'the trial itself' because the trial is where the perjury occurs. And it is possible, even likely, that petitioners will not know of the prosecution's use of perjured testimony until after the opportunity for direct review has passed."). *But see Thompson v. United States*, 45 A.3d 688, 693 (D.C. 2012) (*Napue* claim concerning false pretrial testimony raised on direct appeal). *Napue* itself arose from a "post-conviction petition" for relief from his sentence. *Napue*, 360 U.S. at 267.

Yet the government asserts that *Brecht* should apply to *all* errors raised in a § 23-110 motion, highlighting the federal courts that have applied *Brecht* to non-*Napue* errors raised in motions under 28 U.S.C. § 2255, the federal habeas statute for individuals convicted of federal crimes.[15] It is true, as the government argues, that we often "look[] to federal habeas case law to interpret parallel provisions of" our statute, *Long v. United States*, 163 A.3d 777, 783 (D.C. 2017), but federal habeas case law on this issue does not provide a clear guide. *Brecht* involved a § 2254 petition by a state prisoner, and as discussed *infra*, courts differ on whether *Brecht*

---

[15] *See United States v. Smith*, 723 F.3d 510, 512 (4th Cir. 2013); *United States v. Dago*, 441 F.3d 1238, 1246 (10th Cir. 2006); *United States v. Montalvo*, 331 F.3d 1052, 1057-58 (9th Cir. 2003); *Ross v. United States*, 289 F.3d 677, 682 (11th Cir. 2002); *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000).

applies to *Napue* claims raised under that statute. And while several circuit courts have applied *Brecht* to § 2255 claims brought by federal prisoners, others have declined to choose which harmlessness standard applies to such claims. *See Ruiz v. United States*, 990 F.3d 1025, 1031 (7th Cir. 2021) (noting that it had previously "applied a *Chapman*-like harmless error standard" on a § 2255 claim (citing *Lanier v. United States*, 220 F.3d 833 (7th Cir. 2000))); *Adams v. United States*, 570 F. App'x 126, 129 (3d Cir. 2014). For its part, the D.C. Circuit has applied the *Chapman* standard but has not explicitly decided the issue. *See United States v. Johnson*, 216 F.3d 1162, 1167 n.4 (D.C. Cir. 2000) (applying the *Chapman* standard on a § 2255 motion "because the government argued only the *Chapman* standard below"); *United States v. Green*, 254 F.3d 167, 171 (D.C. Cir. 2001) (applying the *Chapman* standard on a § 2255 motion because the defendant "does not merit relief even under that more favorable standard"); *United States v. Butler*, 955 F.3d 1052, 1069 n.2 (D.C. Cir. 2020) (Katsas, J., dissenting) (characterizing the question whether *Brecht* applies to *Napue* claims or other claims raised under 28 U.S.C. § 2255 as an open question).

In any event, "[t]his court is not bound by federal courts interpreting federal

law."[16] *Toler v. United States*, 198 A.3d 767, 773 (D.C. 2018) (quoting *Fraternal Order of Police, Metro. Police Dep't Labor Comm. v. District of Columbia*, 52 A.3d 822, 829 (D.C. 2012)); *cf. Banks v. Comm'r of Correction*, 259 A.3d 1082, 1096 (Conn. 2021) (explaining that a state court is "free to diverge from the federal courts in defining the legal standards that govern appellate review of claims raised in state habeas petitions"). Thus, *Brecht* and the various circuit court decisions that have considered its application to *Napue* claims raised on federal habeas review, discussed in detail *infra*, are considered only persuasive authority. *See Toler*, 198 A.3d at 773.

### 2. *Brady* and *Napue* Claims on Habeas Review

A review of the broader context of *Napue* claims helps demonstrate why applying *Brecht* here would defy logic. A *Napue* claim is one type of violation under *Brady v. Maryland*, 373 U.S. 83 (1963), the landmark case establishing prosecutors' duties of disclosure. *Brady* prosecutorial obligations are violated by (1) the presentation of perjured, false, or misleading testimony, as defined by *Napue*, or (2) the failure to disclose evidence that is favorable to the defendant. *United States v. Agurs*, 427 U.S. 97, 103-05 (1976) (describing the three *Brady* violations as

---

[16] The Supreme Court recently determined, in an appeal from *state* habeas proceedings, that a *Napue* constitutional error had occurred and remanded for a new trial, but *Brecht* was not cited or discussed. *Glossip*, 145 S. Ct. at 630.

perjured testimony, nondisclosure after a defendant's request for evidence, and nondisclosure without a defendant's request); *Bagley*, 473 U.S. at 680-81 (collapsing the two nondisclosure violations into one category regardless of the defendant's request). These violations are proven by establishing first that the error occurred and then that the error was material. *Id.*

For the *Brady* category related to a prosecutor's duty to disclose evidence, the Court applies a standard of materiality—"reasonable probability"—that is less favorable to defendants than that which applies to perjured testimony claims. *Bagley*, 473 U.S. at 682. After *Brecht* was decided, the Supreme Court explicitly held that the nondisclosure category of violations does not require application of *Brecht*, reasoning that such a *Brady* violation, if material, is already inherently prejudicial under *Brecht*. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

Some courts understood *Kyles*, 514 U.S. at 435, to be a signal from the Supreme Court that *Brecht* review *is* necessary for perjured testimony errors because the difference between the "reasonable likelihood" standard and the "reasonable probability" standard is such that the erroneous admission of knowingly false material testimony may *not* be inherently prejudicial under *Brecht*. *See Clay*, 720 F.3d at 1026; *Trepal*, 684 F.3d at 1112-13; *Gibson*, 262 F.3d at 1062 n.13; *Gilday*, 59 F.3d at 268. This is not how we read the Court's opinion. Because *Kyles*

explicitly acknowledged that it did not "consider the question" and therefore did not "address any claim under the first *Agurs* category," the *Kyles* decision is an inadequate indicator that the Court contemplated treating perjured, false, or misleading testimony violations the opposite from nondisclosure violations when it came to the application of *Brecht*. *Kyles*, 514 U.S. at 433 n.7.

And indeed, the Supreme Court very recently reviewed a *Napue* claim raised in *state* collateral proceedings. *Glossip v. Oklahoma*, 604 U.S. ----, 145 S. Ct. 612, 623 (2025). Although the dissenters asserted that the case should have at least been remanded for the state court to determine whether the violation was "harmless under the [state habeas statute's] prejudice standard," *id.* at 655 (Thomas, J., dissenting), the majority ruled that the defendant was "entitled to a new trial" because "[a] new trial is the remedy for a *Napue* violation." *Id.* at 633. No parties and no amici, save one, presented any arguments about *Brecht*'s application to the *Napue* claim,[17] and the Supreme Court never mentioned *Brecht* in its decision to reverse the conviction.

---

[17] In an amicus brief in support of the petition for certiorari, a group of legal scholars noted that some circuits "have (improperly) overlaid a harmlessness analysis," referring to cases that applied *Brecht* to *Napue* claims. Brief on Petition for Certiorari for Nora Freeman Engstrom et al. as Amici Curiae in Support of Petitioner at 17, Glossip v. Oklahoma, 145 S. Ct. 612 (2025) (No. 22-7466). The same group of scholars, in their amicus brief after certiorari was granted, stated that "*Napue* violations are . . . not further reviewed for harmless error," citing to other Supreme Court cases. Brief for R. Michael Cassidy et al. as Amici Curiae in Support of Petitioner at 16, Glossip v. Oklahoma, 145 S. Ct. 612 (2025) (No. 22-7466).

*Id.* at 618-33 (majority), 633-36 (partial concurrence), 636-659 (dissent).

### 3.      Why *Brecht* Does Not Apply to *Napue* Claims on Habeas Review

The structure of the *Napue* standard—with its built-in materiality test in which harmless error review is already part of the analysis—makes clear that any further harmlessness review under *Brecht* is unnecessary. *See Drake*, 553 F.3d at 241 n.6 ("[C]ertain types of habeas claims, such as errors under *Napue,* are analyzed under their own harmless error standard."). The materiality standard that applies to perjured testimony claims—"reasonable likelihood"—is substantively equivalent to the "harmless beyond a reasonable doubt" rule of *Chapman*, 386 U.S. at 24. *Mitchell*, 101 A.3d at 1008; *Bagley*, 473 U.S. at 679-80 & n.9. The Supreme Court explained that although the reasonable likelihood standard "is stated in terms that treat the knowing use of perjured testimony as error subject to harmless-error review, it may as easily be stated as a materiality standard." *Id.* at 679-80; *see also Haskell*, 866 F.3d at 149 (characterizing *Napue*'s materiality and harmless error standards as "one and the same"); *Mitchell*, 101 A.3d at 1008 (equating "the second *Napue* prong" with "the burden of showing harmlessness . . . beyond a reasonable doubt"). That the second prong of *Napue* already functions as a form of harmless error review obviates any application of *Brecht*: "The whole purpose of the . . . materiality test is to identify those due process harms requiring post-conviction relief. . . . [T]he idea

that a petitioner's claims could satisfy the . . . materiality test . . . but not be entitled to a new trial is insupportable." *Rosencrantz*, 568 F.3d at 593 (Cole, J., dissenting) (citations omitted).

There is also no mandate that *Brecht* be applied universally to constitutional errors in federal habeas proceedings. Structural errors, for example, "defy analysis by harmless-error standards" because "they infect the entire trial process." *Brecht*, 507 U.S. at 629-30 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 307-08, 309 (1991)); *see id.* (noting deprivation of the right to counsel as an example of structural error) (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)). And even a "trial error"—which occurs during the trial process and is still generally reviewed for harmlessness, *see Fortune v. United States*, 59 A.3d 949, 956 (D.C. 2013)—may be "deliberate and especially egregious" or "combined with a pattern of prosecutorial misconduct . . . as to warrant the grant of habeas relief" without *Brecht* review.[18] 507 U.S. at 638 n.9. At least two constitutional trial errors that have harmless error review implicit in their two-pronged analyses also fall outside the purview of *Brecht*.

---

[18] Some jurisdictions, in applying *Brecht* to a *Napue* violation, noted that the knowing presentation of false testimony is not a structural error and thus cannot evade harmless error review. *See Clay*, 720 F.3d at 1026; *Trepal*, 684 F.3d at 1112; *Rosencrantz*, 568 F.3d at 589. We agree with that: Perjured testimony is not structural error. And as explained, it does undergo harmless error review through the analysis of its own materiality standard.

*See Kyles*, 514 U.S. at 435 (holding that *Brecht* does not apply to habeas claims about the failure to disclose material evidence to the defendant under *Brady*); *id.* at 436 & n.9 (noting that claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), need not be reviewed for *Brecht* harmlessness); *see also Andrus v. Texas*, 590 U.S. 806, 821-24 (2020) (per curiam) (directing the trial court, without reference to *Brecht*, to analyze on remand the prejudice prong of a *Strickland* claim raised on habeas). The knowing presentation of false or misleading testimony is another such error.

Further, it would be odd for nondisclosure errors to evade *Brecht* while perjured testimony errors do not because, "[i]f suppression of evidence (and thereby, the truth) is a serious constitutional error, its fabrication is a greater error still." *Haskell*, 866 F.3d at 151. The Supreme Court has "consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair." *Agurs*, 427 U.S. at 103; *see Brecht*, 507 U.S. at 633 (noting that habeas review is "a bulwark against convictions that violate fundamental fairness" (internal quotation marks omitted)). Such an error constitutes a "deliberate deception of a court and jurors" and "is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. at 153 (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)). A prosecutor's knowing presentation of false or misleading testimony thus "cuts to the core of a defendant's right to due process," *Haskell*, 866 F.3d at 152, "not just

because [it] involve[s] prosecutorial misconduct, but more importantly because [it] involve[s] a corruption of the truth-seeking function of the trial process," *Agurs*, 427 U.S. at 103-04; *see Jackson v. Brown*, 513 F.3d 1057, 1076 n.12 (9th Cir. 2008) (explaining that *Napue* materiality is different from *Brady* materiality because "the prosecution's knowing use of perjured testimony will be more likely to affect our confidence in the jury's decision, and hence more likely to violate due process, than will a failure to disclose evidence favorable to the defendant"). That the harmlessness threshold is stricter for the government in a *Napue* case than in a nondisclosure case is, therefore, "a feature, not a bug," of our constitutional jurisprudence and does not need to be rectified by applying *Brecht*. *Haskell*, 866 F.3d at 151.

The false or misleading testimony in this case—a forensic conclusion from an expert witness—is illustrative of the seriousness of such constitutional errors. It is now widely recognized based on the Department of Justice's own findings that "FBI microscopic hair analysts had committed 'widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case.'" *Commonwealth v. Chmiel*, 240 A.3d 564, 566 (Pa. 2020) (quoting Press Release, U.S. Dep't of Justice, *supra*); *see supra* Part II.A. Scientists have concluded that microscopic hair analysis is "highly unreliable" and "cannot uniquely identify one person." Nat'l Rsch. Council, *supra*,

at 156, 161. We have previously described how this "'lack of a statistical foundation' undermine[s] the kinds of 'probabilistic claims' made by microscopic hair examiners" in criminal cases. *Jones*, 202 A.3d at 1162 (quoting Nat'l Rsch. Council, *supra*, at 160). For Mr. Redmond, the government's "probabilistic claim" that the unknown hair from the bedsheet belonged to him contributed to his conviction for a sex offense. In this context, we cannot see how *Brecht*'s "concerns of finality would trump [the] rudimentary demands of justice and fundamental fairness" at stake here. *Haskell*, 866 F.3d at 151; *cf. Mitchell*, 101 A.3d at 1012 ("Although judgment finality is undoubtedly of great importance, it must sometimes yield to higher considerations.").

### III. Conclusion

For all these reasons, we hold that *Napue* violations that are raised in a post-conviction motion under D.C. Code § 23-110 are reviewed for materiality under *Chapman v. California* and are not subject to any further review for harmless error under *Brecht v. Abrahamson*. Because the testimony presented in Mr. Redmond's case was not harmless beyond a reasonable doubt, we reverse the denial of Mr. Redmond's § 23-110 motion, vacate his conviction, and remand for further

proceedings consistent with this opinion.[19]

*So ordered.*

---

[19] Given our conclusion, we need not reach Mr. Redmond's argument that he should have at least received a hearing before the motions court's denial of his § 23-110 motion.